**UNITED STATES of America**

v.

**Jose Adalberto MELGAR, Defendant.**

**No. 1:96CR00012.**

United States District Court,
E.D. Virginia.

May 30, 1996.

Helen Fahey, United States Attorney, Steven Semeraro, Special Assistant United States Attorney, Elisabeth A. Sachs, Special Assistant United States Attorney, Alexandria, Virginia for plaintiff.

Mark Bodner, Fairfax, Virginia, for respondent.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a prosecution of an illegal alien for (i) possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5); (ii) possession of a fraudulent identification card, in violation of 18 U.S.C. § 1546(a); and (iii) possession of marijuana, in violation of 21 U.S.C. § 844. It grows out of a routine traffic stop, followed by a disputed consent search, a subsequent arrest, and an interview of defendant several days later by an Immigration and Naturalization Service ("INS") agent. Defendant moved to suppress the fruits of the search, the arresting officers' impressions of his behavior and demeanor before and during the arrest, and his statement to the INS agent, along with any information the agent obtained later as a result of the statement. This Memorandum Opinion considers the various Fourth, Fifth, and Sixth Amendment issues raised by defendant's motion and sets forth the reasons for its denial.

### I.[1]

While on routine patrol at approximately 3:00 a.m. November 26, 1995, Officer Alan Lowrey of the Arlington County Police Department noticed an automobile traveling behind him along Route 66 in Arlington County with only one functioning headlight, in violation of Virginia Code § 46.2–1030. Officer Lowrey slowed his marked police cruiser to less than 50 m.p.h. to encourage the car to pass him. The car did not do so, choosing instead to slow down below 50 m.p.h. to stay behind the cruiser. Not until Officer Lowrey had slowed even further did the car finally pass him. This behavior sparked Officer Lowrey's interest,[2] and he therefore engaged his emergency equipment to signal the car to pull over to the side of the highway. It did so. When he parked on the highway shoulder behind the automobile, Officer Lowrey counted five occupants inside. Accordingly, he called for backup assistance on his radio, but approached the automobile without waiting for this assistance to arrive. As he did so, he noticed that the side windows for both the front and back seats had been rolled down, even though it was a bitterly cold and windy night. This fact alerted Officer Lowrey because, according to his training and experience, it usually signified that the occupants were either (i) attempting to obtain a better angle from which to shoot at him, or (ii) trying to dispel the odor of contraband. A few more steps brought support for the second theory, for Officer Lowrey detected a strong odor of cologne emanating from the vehicle from several feet away. In his experience, such a strong cologne odor signified the type of heavy cologne dose used not for social success, but to mask the odor of illegal drugs.

When he reached the automobile, Officer Lowrey asked the driver, Adolfo Orosco–Gonzalez ("Gonzalez"), for his license and registration. As he did so, he noticed that all five occupants appeared nervous and fidgety until he explained that he had stopped them because of the broken headlight. At that point, the occupants were noticeably relieved, remarking essentially, "Oh, that's why you stopped us." The occupants' responses and demeanor heightened Officer Lowrey's suspicions that they were trying to hide some form of illegal activity. Gonzalez then gave Officer Lowrey his license and vehicle regis-

---

**1.** Two evidentiary hearings were held on the motion to suppress. At the first, Officers Alan Lowrey and David Torpy and Special Agent Lloyd Miner testified. Agent Miner and Detective Cheryl Mammarella testified at the second, which was scheduled to allow defendant the further opportunity to offer evidence. The facts recounted here are based on the witnesses' testimony, the exhibits offered at the hearings, and the arguments of counsel. They are the Court's findings pursuant to Rule 12, Fed.R.Crim.P.

**2.** Officer Lowrey had received special training in "highway interdiction," the practice of spotting illegal possession of drugs and firearms during routine traffic stops.

tration, and Officer Lowrey returned to the police cruiser, where he conducted the standard computer checks on the license and registration. While doing so, Officer Lowrey also called for the assistance of Officer David Torpy, a fluent Spanish speaker, because he had heard the vehicle's occupants speaking Spanish among themselves and feared that Gonzalez might not be fluent in English.

By the time the computer checks had been completed, with negative results, Officer Torpy had arrived.[3] Officer Lowrey briefed Officer Torpy on the situation, and the two then escorted Gonzalez from his car to the front of Officer Lowrey's cruiser. There, they wrote Gonzalez a warning ticket for the broken headlight and returned his license and registration to him. Speaking in Spanish, Officer Torpy explained the warning ticket. He then asked Gonzalez if there were any drugs or guns in the car and whether the officers might search it. Although Gonzalez denied having any drugs or guns, he did not respond to the search request, and the question itself seemed to make him visibly nervous. This did not escape the officers' notice, for in their experience, Gonzalez's reaction and demeanor were consistent with an effort to conceal illegal activity. Officer Torpy then advised Gonzales that he and his passengers were free to leave, but he also repeated that the officers would like to have permission to search the vehicle. Gonzalez at first refused to allow the search, stating that he thought they could not search the car without a warrant, which he referred to as "piece of paper." Officer Torpy explained that a warrant was not necessary if Gonzalez voluntarily consented to the search, but that Gonzalez and his passengers were still free to leave.

While this discussion was taking place, Officer Lowrey walked back to the passenger side of Gonzalez's car, leaned in, and asked defendant Jose Adalberto Melgar, who was in the front passenger seat, whether there were any guns or drugs in the car. Defendant answered that there were not. Officer Lowrey next asked defendant for identification, and defendant produced a Virginia check-cashing card. Officer Lowrey then returned the card to defendant and rejoined Officer Torpy and Gonzalez at the cruiser, falsely telling Gonzalez that "Jose"—referring to defendant—had said they could search the car. At this point, Gonzalez returned to his car to confer with his passengers.[4] The two officers followed Gonzalez. Officer Torpy then repeated to all five that they were free to leave, but that the officers would appreciate permission to search the car. Defendant told the others, in Spanish, that they should allow the officers to search the car. He also told the officers in English that they could search, and Gonzalez said "Okay, check my car."

Defendant and the remaining three passengers then exited the automobile to permit the search. After defendant alighted, he took a few steps away from the vehicle before reaching back inside to pick up a jacket on the seat that Officer Lowrey had earlier seen defendant holding. Defendant lifted the jacket a few inches, and seeing this, Officer Torpy encouraged him to take the jacket with him because it was cold and windy. Without responding, defendant hesitated, then dropped the jacket back onto the seat and walked away from the vehicle. Then, while Officer Lowrey was searching the vehicle, Officer Torpy engaged its occupants in friendly conversation about where they had been that evening. Although the others responded to his questions, laughing and joking, Officer Torpy specifically recalled that defendant remained quiet, his attention focused instead on Officer Lowrey's search of the vehicle.

---

**3.** By this time, Officer Nordstrom had also arrived on the scene pursuant to Officer Lowrey's first call for assistance. It appears from the record, however, that Officer Nordstrom's responsibilities during this traffic stop focused solely on a second vehicle, which contained friends of Gonzalez and defendant. This second vehicle had been traveling with Gonzalez's vehicle, and when the Gonzalez vehicle was pulled over, this vehicle also pulled over on the shoulder some distance ahead of the police cruiser and Gonzalez's vehicle. Officer Nordstrom's activities were not described in the testimony as they are not material to the resolution of the issues at bar.

**4.** Throughout the discussions between the officers and Gonzalez, Gonzalez was positioned between the officers and his car. The officers never obstructed his path back to the car.

During the car search, Officer Lowrey spotted the jacket on the passenger seat that he had earlier seen Defendant holding. When he lifted the jacket, Officer Lowrey felt the outline of a gun in one of the pockets.[5] Officer Lowrey immediately alerted Officer Torpy of this fact, and the officers promptly halted the search and frisked all five passengers for additional weapons. They found none. After a computer check revealed that defendant had no registered permit for the concealed weapon found in the jacket, the officers, unaware that he was an illegal alien, arrested him for illegal possession of a firearm. The search incident to defendant's arrest disclosed a small amount of marijuana in defendant's sock and an alien identification card, which Officer Lowrey immediately recognized as a fake.

The next day, November 27, 1995, defendant was arraigned in state court on charges of possession of a concealed firearm without a permit, possession of marijuana, and possession of a fictitious government identification card. At his state arraignment, defendant invoked his Sixth Amendment right to the assistance of counsel, and the state court appointed counsel for him.

Also on November 27, 1995, INS Special Agent Lloyd Miner[6] was contacted regarding defendant.[7] Agent Miner's ordinary duties with the INS involve investigating suspected violations of United States immigration laws, and in this connection, he is often called by state law enforcement officers who suspect that they have information about an illegal alien.[8] Such was the case in this instance. Agent Miner testified that he understood the state officer to be calling him with routine information about a suspected illegal alien. He also recalls telling the state officer that he would interview defendant during the week concerning his immigration status—specifically, his alienage and deportability.

Accordingly, Agent Miner went to the Arlington County Adult Detention Center on November 29 to meet with defendant. At the outset of this meeting, he identified himself to defendant as an INS agent and made clear to defendant that he was interviewing defendant only to discuss defendant's immigration status, not defendant's criminal charges. He then advised defendant in Spanish of his *Miranda* rights. Defendant declined to invoke those rights, providing a signed waiver form, which Agent Miner read and explained to him in Spanish. In the statement,[9] defendant admitted that he was

---

**5.** The jacket in fact contained an unloaded revolver and five bullets, carried loosely in the same pocket.

**6.** At this time, as part of his responsibilities with the INS, Agent Miner was serving as a member of the Attorney General's Violent Gang Task Force. Sometime in early 1996, he was appointed to the High Intensity Drug Trafficking Task Force. These task forces are collaborative efforts by state and federal law enforcement officers to target specific crime categories.

**7.** The record is unclear on who first contacted Agent Miner about defendant. Agent Miner testified that (i) he was contacted about defendant at some point both by Detective Mammarella of the Alexandria Police Department, who had heard Agent Miner speak in connection with the Attorney General's task force, and by an officer from Arlington County, whose name he does not recall, and that (ii) he was contacted about defendant sometime during the weekend after Thanksgiving 1995, thus, November 26 or 27. He does not recall which of the two state officers contacted him first. Detective Mammarella testified that she recalls calling Agent Miner about defendant sometime around December 8, 1995. Although it would be consistent with the testimony

of both Agent Miner and Detective Mammarella to find that the officer from Arlington County was the one who contacted Agent Miner Thanksgiving weekend, such a finding is unnecessary to the resolution of the issues at bar. Nor does the possible discrepancy reflect adversely on the credibility of either Agent Miner or Detective Mammarella, as neither kept notes of these communications regarding defendant. It is sufficient to conclude from the record that a state police officer called Agent Miner about defendant, that such calls were routine in connection with Agent Miner's routine INS duty to interview possible aliens to determine their status, and that the call was not part of a conscious plan or effort to circumvent defendant's invocation of his right to counsel in connection with the state charges.

**8.** Agent Miner testified (and convincingly demonstrated) that he speaks Spanish fluently. He also testified that he has extensive experience interviewing aliens (several hundreds) to determine their legal status.

**9.** Agent Miner translated defendant's oral statement into English and then wrote it on the waiver form. At no time during these proceedings

born in El Salvador and that both of his parents are citizens and nationals of that country. He further stated that he had last entered the United States in October 1994 on foot and without inspection, that is, illegally. In addition, when Agent Miner asked if defendant had any identifying scars or marks, defendant showed Agent Miner a tatoo, which Agent Miner recognized as signifying defendant's membership in an El Salvadoran gang, "Mara Salvatrucha."

Following this interview, Agent Miner conducted the standard INS computer checks on defendant. These checks confirmed that defendant is indeed an illegal alien, and given this, the decision was made to prosecute defendant on federal charges. It was not until this time—mid-December, more than a week after Agent Miner's interview with defendant—that Agent Miner was named as case agent, perhaps because he had interviewed defendant. Indeed, Agent Miner testified credibly that at the time of the interview, he assumed someone else would be named case agent if defendant were later prosecuted on any federal charges. At the time of his interview of defendant, his sole interest was defendant's alienage and deportability. On December 18, 1995, defendant, who had been released on bond from state custody, was arrested by federal agents, including Agent Miner. Defendant was indicted on February 20, 1996, and now faces trial for the three federal crimes, namely (i) possession of a firearm by an illegal alien (18 U.S.C. § 922(g)(5)), (ii) possession of a fraudulent identification card (18 U.S.C. § 1546(a)), and (iii) possession of marijuana (21 U.S.C. § 844). Prosecution of his state offenses has been stayed pending resolution of the federal charges.

Defendant now seeks to bar the government from introducing certain evidence in his federal criminal trial. Specifically, he seeks to suppress his statements to Agent Miner on November 29, 1995, and any evidence obtained through the use of those statements. Defendant argues that the statements were obtained in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. He also seeks to suppress the fruits of the searches conducted by Officers Lowrey and Torpy on November 26, 1995, which defendant claims were conducted in contravention of the Fourth Amendment.[10]

## II.

### A. *The Stop*

▮ Fourth Amendment analysis must begin with the officers' initial contact with defendant, for if the stop was illegal, its fruits might be subject to suppression. The law is clear that an officer may stop and detain an individual whenever there is an objective, legitimate basis for doing so. *See United States v. Hassan El*, 5 F.3d 726, 729–31 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994). And the individual's violation of a traffic rule clearly provides such an objective, legitimate basis for a stop. *See Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (holding that stop for traffic violation is not unreasonable under Fourth Amendment). Precisely that occurred here: Gonzalez was driving his vehicle at in the dark with only one operating headlight, in violation of Virginia Code § 46.2–1030.

▮ Moreover, the law is also clear that a law enforcement officer may question an individual without providing *Miranda* warnings in either of two circumstances. First, an officer may question an individual in a public place provided that the individual would reasonably recognize, under all of the surrounding circumstances, that he is free to leave. Because it does not amount to a seizure of the individual's person, this type of encounter does not implicate the Fourth Amendment, and the officer need not be able

has defendant challenged the accuracy of Agent Miner's translation of defendant's statement into English.

10. Defendant's pleadings are less than clear on whether all or just certain fruits of the search are subject to the motion. In any event, this memorandum opinion proceeds on the assumption that all of the items—firearm, bullets, identification card, marijuana, and the officers' observations of defendant's demeanor during the search—are subject to the motion.

to articulate why he suspected the individual questioned. *See Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *United States v. Gordon,* 895 F.2d 932, 937 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). Here, the conversations among the officers, Gonzalez, and defendant took place in public, and Gonzalez and defendant were repeatedly told they were free to leave once Gonzalez received his warning citation. Accordingly, the officers' questioning after that point did not constitute a seizure of defendant; his Fourth Amendment rights were not implicated, much less violated, on that basis.

■ Alternatively, the officers properly questioned Gonzalez and defendant as part of a *Terry* stop. In a *Terry* stop, an officer may detain an individual for investigatory purposes. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This is a seizure of the person, as the individual is not free to leave while the officer conducts further investigation. Accordingly, to conduct a *Terry* stop consistently with the Fourth Amendment, the officer must have a reasonably articulable suspicion that the person stopped was, is, or is about to be, engaged in criminal activity. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85. This reasonable suspicion is a "commonsensical proposition," crediting the officer's special training and experience. *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). It is, moreover, a lesser showing than probable cause. *United States v. Perrin,* 45 F.3d 869, 872 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2287, 132 L.Ed.2d 289 (1995). And once the stop pursuant to reasonable suspicion is made, the officer may continue to ask questions reasonably directed at confirming or dispelling his suspicion that criminal activity is afoot; *Miranda* warnings are required only when the "suspect's freedom of activity is curtailed to a degree associated with formal arrest," that is, when the suspect is taken into custody. *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984); *see also United States v. Leshuk,* 65

F.3d 1105, 1110 (4th Cir.1995) (holding that individuals subjected to *Terry* stop were not in custody).[11]

■ This is precisely what happened here. The officers had the reasonable articulable suspicion necessary to question the men pursuant to a *Terry* stop: the automobile had slowed suspiciously to avoid passing Officer Lowrey's cruiser; the passengers had rolled down their windows upon being stopped despite the bitterly cold air; Officer Lowrey had detected a pungent odor of cologne when he was still several feet from the automobile; and the men had all seemed unduly nervous until Officer Lowrey told them they had been stopped only for the headlight violation. Based on Officer Lowrey's experience and training, these were all indicators that there was contraband in the car. Accordingly, he and Officer Torpy were permitted to question the men regarding the suspected criminal activity without violating their Fourth Amendment rights.

■ Of course, detention pursuant to a *Terry* stop may become unreasonable and thus violative of the Fourth Amendment if it is overlong. In the context of an automobile stopped for a traffic violation, the detention may properly continue until the officer has obtained the driver's license and registration, performed the standard computer checks, and explained the nature of the warning or ticket. *United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.), *cert. denied,* 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). The officers' detention of Gonzalez and defendant lasted only this long. When Gonzalez and defendant were then explicitly informed that they were free to leave, the detention was over, and their subsequent conversations with the officers were in the nature of a consensual encounter. *See id.* at 877. In sum, at no time before the search of the car did the officers unreasonably seize defendant's person and violate his Fourth Amendment rights. It follows that the motion to suppress on this ground fails.

---

**11.** An individual stopped for a traffic offense is not in custody. *Berkemer,* 468 U.S. at 439–40,

104 S.Ct. at 3149–50.

## B. The Search

The next step in the analysis involves the searches. Preliminarily, it is important to note that the Fourth Amendment right is a personal one which may not be vicariously asserted; an individual cannot complain that the search or seizure of someone else violated his right to privacy. *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969). And this rule is equally true for the search and seizure of things, as for people. Thus, an individual's Fourth Amendment rights are not violated when an article is searched or seized unless "the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980).

This general rule leads to two more specific rules in the context of automobile searches. First, the law is clear that the passenger of a vehicle has no reasonable expectation of privacy in the vehicle's contents. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978) (articles in glove compartment and under seat); *Rusher,* 966 F.2d at 874 (articles in bed of truck); *United States v. Paulino,* 850 F.2d 93 (2d Cir.1988) (articles under floor mat of car), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989). This principle extends to personal property the passenger may have placed in another's car; "[a] person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects...." *United States v. Hargrove,* 647 F.2d 411, 413 (4th Cir.1981). In addition, because of the personal nature of the Fourth Amendment's protection, an individual has no reasonable expectation of privacy in articles of which he has disclaimed ownership. *United States v. Leshuk,* 65 F.3d 1105, 1111 (4th Cir.1995) (stating that "a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property"). Here, because he was merely a passenger in the car, he cannot claim that Officer Lowrey's search of it in-

vaded a personal, legitimate expectation of privacy in the vehicle's contents, including the jacket in which the gun was found. And his disclaimer of ownership of the jacket further buttresses the conclusion that he had no legitimate expectation of privacy in it. Accordingly, the motion to suppress the firearm and bullets is without merit.

The same result would obtain even if defendant could claim ownership of, and a reasonable expectation of privacy in, the car, the jacket, or both. An individual waives his reasonable expectation of privacy when he voluntarily consents to a search, and the ensuing search comports with the Fourth Amendment to the extent that it is consistent with the consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). Whether consent is voluntarily given, as opposed to coerced by law enforcement pressure, is judged by the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980) (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48). Factors to consider in this analysis include the location of the encounter (e.g., a public place, as opposed to the police station); the number of officers and suspects present; whether the officers displayed their weapons; whether there was physical contact; whether the officers used language or a tone of voice indicating threats or compulsion; the subjective state of mind, age, and intelligence of the consenting party; the length of the detention; and the individual's knowledge of his right to refuse consent. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

Given these settled principles, it is clear that Gonzalez and defendant consented to the search of the car. Defendant said to Gonzalez in Spanish, "Go ahead, let them search," and he also told the officers in English that they could conduct a search of the car. Gonzalez then said to the officers, "Okay, search my car." Under the circumstances, it is apparent that these consents were freely and voluntarily given. The encounter occurred in an open, public place. *Cf. Watson,* 423 U.S. at 424, 96 S.Ct. at 828 (upholding consent to search given by sus-

pect in custody, emphasizing that consent occurred on street rather than at police station). Only three officers were on the scene, none of whom drew their weapons, and Gonzalez and defendant were accompanied by three other friends in Gonzalez's car and more in another car that had pulled onto the shoulder just ahead. Neither Gonzalez nor defendant was restrained in any way, and the officers returned Gonzalez's documentation to him before inquiring about contraband. *Cf. Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879 (upholding consent, emphasizing that suspect's documentation had been returned prior to request for consent). Significantly, the officers repeatedly informed the men that they were free to go. *Cf. id.* at 558–59, 100 S.Ct. at 1879–80 ("[I]t is especially significant that the respondent was twice expressly told that she was free to decline to consent."). To be sure, Gonzalez and defendant are relatively young and speak little English, but the fact that Officer Lowrey expressly requested Officer Torpy's help to translate weakens any weight this factor might have against a finding of consent. In any event, this one factor is insufficient to vitiate an otherwise voluntary consent. *Cf. id.* at 558, 100 S.Ct. at 1879 (upholding consent of twenty-two-year-old female high school dropout where male officers displayed no show of force or threats). In sum, there is no evidence of coercion by the officers that would call into question the voluntariness of either Gonzalez's or defendant's consent to the search of the car, and the search was therefore fully consistent with their rights under the Fourth Amendment. *See Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043–44.

▬ The motion to suppress the items found on defendant's person fails as well. Once an individual has been placed under lawful arrest, his reasonable expectations of privacy are to some degree trumped by the public interest in protecting the safety of the arresting officer and the public at large and in preventing the destruction of evidence. Thus, it has long been settled that the arresting officer may conduct a reasonable search incident to arrest. *See, e.g., Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[12] And this search incident to arrest may reasonably include, at a minimum, a search of the arrestee's person. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). No more than this occurred here. The motion to suppress the false identification card and the marijuana in defendant's sock must be denied.[13]

### III.

The Sixth Amendment explicitly guarantees an accused "the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. And the Fifth Amendment's prohibition against compelled self-incrimination has been read to include, *inter alia,* a right to the assistance of counsel to help enforce the prohibition. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Here, defendant argues that his interview with Agent Miner violated his right to counsel under both the Sixth and Fifth Amendments. Neither argument succeeds.

### A. The Fifth Amendment

▬ The scope of an accused's right to counsel under the Fifth Amendment is bounded by the explicit right from which it is derived—namely, the right to be free from compelled self-incrimination. Thus, the Fifth Amendment right to counsel arises only in situations where the right to be free from compelled self-incrimination might be threatened, as, for example, where an individual is subjected to custodial interrogation by the

---

12. The reasonableness of the search incident to arrest may be measured in terms of the purposes underlying it. Thus, while the arresting officer is authorized to search areas within the reach of the arrestee to uncover weapons or evidence, this authorization does not extend to searches of "desk drawers or other closed or concealed areas in [the] room itself." *See Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040.

13. Indeed, defendant apparently challenges these searches and seizures only insofar as they were "fruit of the poisonous tree" of the search of the car and resulting seizure of the gun. *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) (applying "fruit of the poisonous tree" doctrine to evidence seized as result of illegal stop).

police. And it is triggered only by "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis in original).

▮ In other words, an accused does not invoke his Fifth Amendment right to counsel by requesting the assistance of counsel in a context other than interrogation. In *McNeil,* for example, the defendant argued that his request for counsel at an initial appearance on a charged offense was suffi- cient to invoke his Fifth Amendment right to counsel. The Supreme Court disagreed, holding that the Fifth Amendment right "applies only when the suspect 'ha[s] *expressed* his wish for the particular sort of lawyerly assistance that is the subject of *Miranda,*'" that is, assistance in dealing with questions from the police in the custodial context. *McNeil,* 501 U.S. at 178, 111 S.Ct. at 2209 (quoting *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981)) (emphasis in original). But where the right is properly invoked, it applies to all custodial interrogation whatever the subject. Put another way, the Fifth Amendment right to counsel is not "offense specific"; it does not attach solely with respect to the charged conduct. "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil,* 501 U.S. at 177, 111 S.Ct. at 2208 (citing *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)); *see also Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (holding that further questioning may not occur after an assertion of the Fifth Amendment right to counsel unless counsel is physically present); *United States v. Martinez,* 972 F.2d 1100 (9th Cir. 1992) (following *McNeil* in case where defendant had been questioned about essentially same offense on which charges were pending). If the suspect is interrogated without counsel in violation of this right, his statements are presumed involuntary and are therefore inadmissible at trial, even where

the suspect executes a waiver that would render his statements voluntary under traditional standards. *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). But the law is clear that an assertion of the Fifth Amendment right must occur in the interrogation context.

▮ In this case, defendant did not assert his Fifth Amendment right to counsel; to the contrary, he explicitly waived that right after Agent Miner twice read him his *Miranda* rights in Spanish. There is nothing to suggest that this waiver was anything less than fully informed and voluntary. And although he requested counsel at his arraignment on the state charges that grew out of his November 26 arrest, he does not complain of any interrogation pertaining to the state charges. Indeed, there was no interrogation on these charges. And defendant admits that he did not explicitly request counsel when he was questioned by Agent Miner, nor did he make any statement that could reasonably be construed as expressing a desire for the assistance of an attorney in dealing with custodial questioning by Agent Miner. Accordingly, Agent Miner's questioning on November 27 was fully consonant with defendant's Fifth Amendment rights. The motion under the Fifth Amendment to suppress defendant's voluntary statements to Agent Miner on that date, along with any fruits therefrom, must be denied.

### B. The Sixth Amendment

▮ The Sixth Amendment right to counsel differs from its Fifth Amendment counterpart. It is broader in one sense and narrower in another. It is broader than the Fifth Amendment right because it applies at any critical stage of the prosecution, not merely during custodial interrogation. *McNeil,* 501 U.S. at 178, 111 S.Ct. at 2209. At the same time, the Sixth Amendment right to counsel is narrower than the Fifth Amendment in another respect because it relates only to interrogation regarding a crime for which a prosecution is pending, *id.;* it is, unlike the Fifth Amendment right, offense specific. An individual thus cannot

invoke this right once for all future prosecutions, as the right does not attach until a prosecution formally begins and "the adverse positions of government and defendant have solidified" with respect to a particular alleged offense. *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). Once a criminal accused has invoked his right to counsel under the Sixth Amendment with respect to an offense for which the right has attached, any subsequent waiver during a custodial interview initiated by a law enforcement officer has no effect. *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Thus, once an individual has been charged with a crime and has requested the assistance of counsel for his defense, he may not be questioned by law enforcement officials about that crime without his counsel present. If he is, any information intentionally elicited from him is obtained in violation of his Sixth Amendment rights and is therefore inadmissible in the government's case at the trial for that offense.[14]

While the analysis for determining whether two offenses should be deemed the same or separate for purposes of the Sixth Amendment has not been definitively stated, a few illuminating principles emerge from the case law. For instance, in *United States v. Martinez,* 972 F.2d 1100 (9th Cir. 1992), the defendant was charged with being a felon in possession of a firearm in both an earlier state prosecution and a later federal one. Before the federal charge was brought, his interrogation by federal officers focused on his possession of a gun, which was an element of the state charge. Given these facts, the Ninth Circuit held that the Sixth Amendment right would be deemed to have attached to the later federal charge if the

defendant could show collusion between the federal and state authorities to circumvent his right to counsel. *Id.* The lesson of *Martinez* is simple: a Sixth Amendment right invoked by an accused with respect to a state offense may also apply to questioning in connection with a distinct federal offense where it appears that federal and state authorities colluded to circumvent the accused's asserted Sixth Amendment right. Nothing of the sort occurred here. As Agent Miner's uncontradicted and credited testimony makes clear, his interview of defendant was not the product of state-federal collusion to thwart defendant's invoked Sixth Amendment right. Thus, the interview covered only defendant's legal status in this country and did not include any questions about, or mention of, the weapon, the marijuana, or even the false identification card.[15]

Nor can defendant demonstrate collusion and resuscitate his Sixth Amendment claim by contending that the state and federal offenses here, while nominally distinct, fall within the "related offense" exception to the Sixth Amendment's offense-specific nature. Such an exception, to be sure, exists.[16] But the scope and rationale of the exception do not extend to this case. Simply put, the rationale for the "related offense" exception, that is, for prohibiting interrogation about a closely related but uncharged offense, is to prevent any statements the accused made about the uncharged offense from being used to further the prosecution of the charged offense, as to which the accused has asserted his Sixth Amendment right. This rationale points to an important limit to the exception, which is well illustrated by the Fourth Circuit's decision in *United States v. Kidd,* 12 F.3d 30 (4th Cir.1993). There, a Fourth Circuit panel held that an uncharged

14. Yet, just as the Sixth Amendment is offense specific, so too is the remedy for its violation; "[i]ncriminating statements pertaining to other crimes as to which the Sixth Amendment has not yet attached are, of course, admissible at a trial of those offenses." *Maine v. Moulton,* 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985).

15. The identification card's falsity, as Officer Lowrey testified, was readily apparent on its face. Thus, the interview was unnecessary for, and unrelated to, the state's charge of possessing a false identification card.

16. *See, e.g., People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988) (extending defendant's Sixth Amendment right was extended to uncharged offense that was found to be closely related to offenses for which defendant had been charged and had requested counsel); *see also Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (Supreme Court vacated defendant's convictions for burglary and theft even though formal charges for burglary had not been commenced at time inadmissible statements were made).

offense would not fall within the "related offense" exception to the offense-specific limitation inherent in the Sixth Amendment right to counsel unless it derived from the same "factual predicate" as the charged offense. In applying this test, the panel made clear that offenses share the same factual predicate only if evidence or statements obtained with respect to the uncharged offense can be used to establish the charged offense. Indeed, it is in this respect that the *Kidd* panel distinguished the "related offense" cases where government-initiated contact had run afoul of the Sixth Amendment. In those cases, the panel emphasized, the government's post-indictment investigation had produced new evidence regarding the *pending* charges. *Kidd* differed because, "[b]y contrast, neither Kidd nor the government informant even mentioned Kidd's pending charges at the post-indictment transaction." *Kidd,* 12 F.3d at 32–33. Precisely the same is true here. Agent Miner questioned defendant only about his immigration status, a subject not necessary to prove the state offenses as to which defendant's Sixth Amendment right to counsel had attached. Put another way, defendant's illegal immigration status, the subject of Agent Miner's interview, did not derive from the same "factual predicate" as the charged state offenses, and the information Agent Miner obtained from defendant produced no evidence needed to prove the pending state charges. Thus, like *Kidd,* this case is distinguishable from the "related offense" cases on which defendant relies.[17] There is simply no evidence of collusion between state and federal authorities in this case, and, accordingly, the motion to suppress on Sixth Amendment grounds must be denied.

An appropriate Order has issued.

---

**17.** Defendant chiefly relies on *People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988). In *Clankie,* the defendant was questioned about his involvement with a later burglary at the same location as an earlier series of burglaries with which the defendant had already been charged and for which he had requested counsel. *See id.* Defendant's statements admitting his involvement in the later, uncharged burglary were thus also important to establish his guilt in the case of the charged conduct. By contrast, none of the information elicited in Agent Miner's interview of defendant is necessary to prove the state charges. This confirms the absence of collusion in the instant case.