**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 96-4582

JOSE ALDALBERTO MELGAR, a/k/a
Jose Aldalberto Melgar-Campos,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-96-12-A)

Argued: October 27, 1997

Decided: April 8, 1998

Before RUSSELL,* MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Mark Howard Bodner, Fairfax, Virginia, for Appellant.
Mark Samuel Popofsky, UNITED STATES DEPARTMENT OF

_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Ian Simmons, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

The sole issue presented in this case is whether the district court committed reversible error in refusing to suppress statements taken from a defendant assertedly in violation of his Fifth and Sixth Amendment rights to counsel. Because the defendant waived his Fifth Amendment right and because the Sixth Amendment violation constituted harmless error, we affirm.

I.

We review de novo the ultimate question of whether the government violated a defendant's Fifth and Sixth Amendment rights, but we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, ___ U.S. ___, 116 S. Ct. 1657, 1663 (1996); see also United States v. Sprinkle, 106 F.3d 613, 616-17 (4th Cir. 1997). Accordingly, we set forth below the relevant facts as found by the district court. See United States v. Melgar, 927 F. Supp. 939, 943-46 (E.D. Va. 1996).

At approximately 3:00 a.m. on November 26, 1995, Officer Alan Lowrey of the Arlington County Police Department observed an automobile traveling behind him with only one functioning headlight, in violation of Va. Code § 46.2-1030 (1996). After further observation, Officer Lowrey signaled to the car to pull over. He noted that five occupants were inside and that the car windows were rolled down despite the fact that it was a bitter cold evening. Officer Lowrey asked the driver for his license and registration. While Officer Lowrey checked the documents against computer records, back-up officers

2

arrived, including Officer David Torpy. In Spanish, Officer Torpy asked the driver of the car if there were any drugs or guns in the car and whether the officers could search the car. The driver denied having any drugs or guns and did not immediately respond to the search request.

As Officer Torpy discussed with the driver whether he would consent to a search, Officer Lowrey walked back to the passenger side of the car and asked Jose Aldalberto Melgar, who was in the front passenger seat, whether there were any drugs or guns in the car. Melgar, too, asserted that there were none.

When the driver eventually consented to a search of his car, Melgar got out of the car. He initially took his jacket with him, then hesitated and left it behind. As Officer Lowrey searched the car, he spotted this jacket on the front passenger seat. Officer Lowrey lifted the jacket and felt the outline of a gun in one of the pockets. After a computer check revealed that Melgar did not have a registered permit for the concealed weapon, the officers arrested him for illegal possession of a firearm. A search incident to Melgar's arrest uncovered a small amount of marijuana and an alien identification card, which, the district court expressly found, "Officer Lowrey immediately recognized as a fake." Melgar, 927 F. Supp. at 945.

The next day Melgar was arraigned in state court on charges of possession of a concealed firearm without a permit, possession of marijuana, and possession of a fictitious government identification card. At his state arraignment, Melgar invoked his right to assistance of counsel, and the court appointed counsel for him.

On the same day, a state law enforcement officer contacted Immigration and Naturalization Service (INS) Agent Lloyd Miner regarding Melgar. Agent Miner's ordinary duties with the INS involve investigating suspected violations of United States immigration laws, and he is often called by state law enforcement officers who believe that they have information about illegal aliens. Miner understood the state officer in this case to be calling him with routine information about a suspected illegal alien. Miner told the state officer that he would interview Melgar during the week regarding his immigration status -- specifically Melgar's alienage and eligibility for deportation.

3

The district court found that the state officer's contact with Miner "was not part of a conscious plan or effort to circumvent defendant's invocation of his right to counsel in connection with the state charges." Id. at 945 n.7.

Miner interviewed Melgar two days later on November 29, 1995, at the local detention center where Melgar was held. At the outset of the interrogation, Miner identified himself to Melgar as an INS agent and told Melgar that he was interviewing him only to discuss Melgar's immigration status, not the state criminal charges. Miner twice advised Melgar in Spanish of his Miranda rights. Melgar signed a written waiver of those rights.

During the interrogation, Melgar admitted to Agent Miner that he was born in El Salvador and that both of his parents were citizens and nationals of that country. He further stated that he had last entered the United States in October 1994 illegally. In addition, when Agent Miner asked if Melgar had any identifying scars or marks, Melgar showed Miner a tattoo, which Miner recognized as the symbol of membership in an El Salvadoran gang, "Mara Salvatrucha."

Following the interview, Agent Miner conducted the standard INS computer checks, which confirmed Melgar's status as an illegal alien. At this time, in mid-December, more than a week after Agent Miner's interview with Melgar, Miner was named as case agent. The district court found that "Agent Miner testified credibly that at the time of the interview [of Melgar], he assumed someone else would be named case agent if defendant were later prosecuted on any federal charges," and that "[a]t the time of his interview of defendant, his sole interest was defendant's alienage and deportability." Id. at 946.

On December 18, 1995, federal agents -- including Agent Miner -- arrested Melgar, who had been released on bond from state custody. On February 20, 1996, the United States indicted Melgar for possession of a firearm by an illegal alien in violation of 18 U.S.C.A. § 922(g)(5) (West Supp. 1996), possession of marijuana in violation of 21 U.S.C.A. § 844 (West 1981 & Supp. 1997), and possession of a fraudulent identification card in violation of 18 U.S.C.A. § 1546(a) (West Supp. 1997). Prosecution of the state offenses was stayed pending resolution of the federal charges.

Melgar moved to suppress the statements taken from him by Agent Miner, asserting, inter alia, that they were elicited in violation of his

right to counsel. After conducting two evidentiary hearings, Judge T. S. Ellis, III, entered an order denying the suppression motion. A few weeks later, Judge Ellis issued an opinion, carefully setting forth the reasons for that order. Melgar, 927 F. Supp. at 939. A jury ultimately convicted Melgar of all three offenses. Judge James C. Cacheris sentenced him to a term of eighteen months imprisonment each on the gun and fraudulent identification card charges, and twelve months on the marijuana charge, all to run concurrently.

II.

On appeal, Melgar claims only that Judge Ellis erred in refusing to suppress his statements to Agent Miner. Melgar asserts that Miner's interrogation of him, after he invoked his right to counsel in state court, contravened his constitutional rights. The Fifth and the Sixth Amendment each guarantee a right to assistance of counsel; Melgar maintains that the government violated both provisions in his case.

The Sixth Amendment, of course, specifically provides a right to counsel: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In Massiah v. United States , 377 U.S. 201, 206 (1964), the Supreme Court established that this right prohibits the government from deliberately eliciting "incriminating evidence" from an accused "after he ha[s] been indicted and in the absence of his counsel." Unlike the Sixth Amendment, the text of the Fifth Amendment contains no specific guarantee of counsel, but the constitutional protection against compelled self-incrimination has long been held to include an additional right to counsel. See, e.g., Miranda v. Arizona, 384 U.S. 436 (1966). The Fifth and Sixth Amendment rights to counsel differ not only in origin but also in purpose and scope.

The purpose of the Fifth Amendment right "is to protect . . . the suspect's desire to deal with the police only through counsel." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (internal quotation omitted). "The purpose of the Sixth Amendment guarantee . .. is to protec[t] the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." Id. at 177-78 (internal quotation omitted; emphasis and alteration in original).

5

Because, as Judge Ellis recognized, "[t]he scope of an accused's right to counsel under the Fifth Amendment is bounded by the explicit right from which it is derived -- namely, the right to be free from compelled self-incrimination," this right "arises only in situations where the right to be free from compelled self-incrimination might be threatened, as, for example, where an individual is subjected to custodial interrogation by the police." Melgar, 927 F. Supp. at 949-50. Outside the context of a custodial interrogation, the Fifth Amendment does not afford a suspect the right to counsel. In contrast, a defendant need not be the subject of interrogation in order to invoke his Sixth Amendment Massiah right to counsel. Rather, this right applies at any critical stage of the prosecution. For these reasons, in McNeil, the Supreme Court, recognizing that an accused had invoked his Sixth Amendment right to counsel at his initial court appearance, rejected a claim that he had also thereby invoked his Fifth Amendment right to counsel. See McNeil, 501 U.S. at 178-79. In this respect then, the Fifth Amendment guarantee is narrower than that of the Sixth Amendment. Id.

However, in another respect, the scope of the Fifth Amendment right is broader. Id. If a suspect requests counsel in an interrogation context, the Fifth Amendment affords him protection regardless of the subject of the interrogation. Once a suspect properly invokes his Fifth Amendment right to counsel, he may not be questioned "regarding any offense unless counsel is present." Id. at 177 (emphasis added). Thus, the Fifth Amendment right is not "offense specific"; it does not apply only to previously charged conduct. The Sixth Amendment guarantee, however, is offense specific: "[i]t cannot be invoked once for all future prosecutions." Id. at 175.

Both the Fifth and Sixth Amendment rights to counsel can be waived at the outset. Once the right to counsel is properly invoked, however, "any subsequent waiver during a police-initiated custodial interview is ineffective," id. at 175 (citing Michigan v. Jackson, 475 U.S. 625 (1986) (Sixth Amendment)); "the current interrogation [must] cease" and "[i]f the police do subsequently initiate an encounter in the absence of counsel . . . the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." Id. at 177 (Fifth Amendment).

6

With these principles in mind, we turn to the case at hand.

III.

Melgar maintains that Agent Miner violated his Fifth Amendment rights "by impermissibly initiating an interrogation after his request for appointment of counsel." Brief of Appellant at 14. Melgar explains that he

> invoked his right to counsel at arraignment in the Arlington County General District Court on the day following his arrest on Virginia charges. INS Agent Miner went to the Arlington ADC to see Melgar, not at Melgar's invitation or request, to interrogate him about matters later used in the federal prosecution against him. Melgar's counsel was not present. This was in violation of Melgar's Fifth Amendment right not to be interrogated after his request for counsel.

Id. at 21. In view of the controlling legal principles set forth above, Melgar's Fifth Amendment argument must fail.

First, although Melgar invoked his right to counsel at his arraignment on state charges, the right invoked was grounded in the Sixth Amendment, not the Fifth. In order for the Fifth Amendment protection to arise, a suspect must be in a custodial interrogation context. Melgar's arraignment did not constitute an interrogation any more than the initial hearing in McNeil constituted an interrogation. McNeil, 501 U.S. at 178-79. Accordingly, when Melgar requested counsel at his state arraignment, no Fifth Amendment right was available to him. Of course, a Sixth Amendment right to counsel was available at the time of arraignment and, in accord with it, the state judge appointed counsel for Melgar.

A few days after his arraignment in state court, Agent Miner interrogated Melgar. If Melgar had requested counsel at that juncture, he could have availed himself of his Fifth Amendment right to counsel, but Melgar did not ask for counsel at any time during the interrogation. Rather, after Agent Miner twice read Melgar his Miranda rights in Spanish, Melgar signed a written waiver of them. Moreover, as Judge Ellis found, "nothing . . . suggest[s] that this waiver was anything less than fully informed and voluntary." Melgar, 927 F. Supp. at 950.

7

For these reasons, Agent Miner's interrogation of Melgar did not violate the Fifth Amendment. Judge Ellis correctly rejected Melgar's claim to the contrary.

IV.

Melgar's Sixth Amendment argument presents a more complicated question. Melgar undoubtedly invoked his Sixth Amendment right to counsel at his arraignment. Accordingly, Melgar's written waiver of his Fifth Amendment right to counsel, obtained at the outset of his interview with Agent Miner, was "ineffective" in waiving his previously invoked Sixth Amendment right. McNeil, 501 U.S. at 175. The government reminds us that the Sixth Amendment right to counsel is "offense specific," id., and thus maintains the "fact that no federal charges . . . were pending" against Melgar at the time of his state arraignment and invocation of Sixth Amendment rights"should dispose" of this claim. Brief of Appellee at 24.

Melgar, however, contends that his federal offenses were so "inextricably intertwined" or "closely related" to the state charges for which he had invoked his Sixth Amendment right to counsel, that to invoke the right for one was essentially to invoke the right for the other. See, e.g., United States v. Arnold, 106 F.3d 37, 40-41 (3d Cir. 1997) ("the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense"). As we have recently recognized, application of the offense-specific rule means that "government investigations of new criminal activity for which an accused has not yet been indicted do not violate the Sixth Amendment right to counsel." United States v. Kidd, 12 F.3d 30, 31 (4th Cir. 1993) (emphasis added). The crux of Melgar's argument is that the government cannot ostensibly launch an investigation of, or interrogation about, "new" crimes if those "new" crimes are so inextricably intertwined with the "old" (i.e., already charged) crimes that interrogation about the "new" amounts to interrogation about the "old."

Maine v. Moulton, 474 U.S. 159 (1985), offers support for this contention. There, the Supreme Court held that the government violated a defendant's Sixth Amendment right to counsel when it interrogated him post-indictment without counsel, even though this interrogation

8

was part of a legitimate investigation of "new" crimes. Id. at 176-80. Once the Sixth Amendment right attaches, the government must honor it, which "means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel." Id. at 171. Rather, the Sixth Amendment imposes on the government "an affirmative obligation" to "respect and preserve" this choice, and the government cannot "act in a manner that circumvents and thereby dilutes" this Sixth Amendment right. Id. Accordingly, even when the government legitimately investigates other, unrelated crimes, it may not elicit from, and ultimately use against, the defendant "incriminating statements pertaining to pending charges" if in obtaining the evidence the government "knowingly circumvent[s]" the defendant's right to counsel. Id. at 180.

Prior to Moulton, numerous courts had held that Massiah "did not protect a defendant from the introduction of postindictment statements deliberately elicited when the police undertook an investigation of separate crimes." Id. at 189 (Burger, C.J. dissenting) (listing cases). "So long as investigating officers show[ed] no bad faith and d[id] not institute the investigation of the separate offense as a pretext for avoiding the dictates of Massiah," such evidence was held admissible at trial of the original crime. United States v. Darwin, 757 F.2d 1193, 1199 (11th Cir. 1985). Over a vigorous dissent, the Moulton Court expressly rejected this standard:

> In seeking evidence pertaining to pending charges, .. . the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah. . . . Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

9

Moulton, 474 U.S. at 180.

In Moulton, the state initially charged the defendant with four counts of theft, all involving receipt of stolen vehicles and stolen auto parts. Id. at 162. Subsequently, a government informant surreptitiously recorded incriminating statements from the defendant about these charges as well as other crimes, including burglary -- stealing the auto parts -- and attempted murder of a state's witness. Id. The government then dismissed the pending indictment and obtained a new indictment, which contained the original theft charges and the previously uncharged burglary charge, but not the attempted murder charge. Id. at 167. After the defendant was found guilty of theft and burglary at a trial in which the prosecution relied on the incriminating recorded conversations, he appealed to the Supreme Judicial Court of Maine. That court held that the incriminating statements were inadmissible and could not be used to prove either the theft offenses for which the defendant had been indicted prior to the incriminating conversation, or the burglary offense for which he had not been indicted until after that conversation; accordingly, the court ordered a new trial on the theft and burglary counts. Id. at 168.

The state petitioned for a writ of certiorari, which the Supreme Court granted. Id. Emphasizing that "at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents . . . the protection afforded by the right to counsel," the Moulton Court held that the government's post-indictment questioning of the defendant "knowingly circumvent[ed]" his right to counsel and so violated his Sixth Amendment rights. Id. at 171, 176-77. In doing so, the Court affirmed the state court's determination that the post-indictment interrogation required a new trial on the theft counts, which had been previously charged, and the closely-related burglary count which had not been charged until after the interrogation. Id. at 180. Conversely, the Court noted that "[i]ncriminating statements pertaining to other crimes [e.g., attempted murder] as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." Id. at 180 n.16. Thus, in Moulton the Supreme Court recognized, albeit sub silentio , that once a defendant has invoked his Sixth Amendment right to counsel, although the government is generally free to interrogate him without counsel as to crimes to which that right has not attached, the government may not

10

knowingly question him as to crimes closely related to those to which his Sixth Amendment right has attached.**1**

Lower courts have followed Moulton and concluded that the "Sixth Amendment right to counsel extends to interrogations on new charges where the pending charge is . . . inextricably intertwined with the charge under investigation." United States v. Doherty, 126 F.3d 769, 776 (6th Cir. 1997) (internal citations and quotations omitted) (collecting cases); see also United States v. Micheltree, 940 F.2d 1329, 1342 (10th Cir. 1991) ("when a deliberate Sixth Amendment violation occurs concerning the pending charges, the government may not use defendant's uncounseled incriminating statements at a trial of those or very closely related subsequent charges"). As the Third Circuit

_____

**1** The Supreme Court has never retreated from Moulton. In Brewer v. Williams, 430 U.S. 387, 390, 398-400 (1977), the Court similarly held that after a defendant's Sixth Amendment rights attached as to an abduction charge, the government could not use statements subsequently elicited from him as to the location of the victim's body at trial on the later-charged, closely related, crime of murder. In McNeil, 501 U.S. at 174 (quoting Moulton, 474 U.S. at 180 n.16), and Moran v. Burbine, 475 U.S. 412, 416 (1986), the Court reiterated the general rule that incriminating statements pertaining to crimes "other" than the pending charges are admissible at trial on those charges, without discussing the closely related exception. However, neither case offered the Court any reason to do otherwise because the post-indictment interrogations in McNeil and Moran elicited information only as to offenses not closely related to the charged offense. See McNeil, 501 U.S. at 175 (after charged with robbery in West Allis, defendant was interrogated (and later charged and convicted) of "unrelated, uncharged" offenses-- a murder, attempted murder, and robbery in Caledonia) (internal quotation omitted); Moran, 475 U.S. at 416 (after defendant was arrested in connection with a burglary in Cranton he was interrogated (and then charged) with an unrelated murder in Providence). Moulton is the sole instance in which the Court has been presented with a post-indictment interrogation about two sorts of offenses in addition to those originally charged-- one closely related to the originally charged offenses and one not. Burglary of the auto parts was closely related to the originally charged theft of those same parts -- both crimes occurred at the same time and place and involved the same victim and circumstances. The attempted murder, however, was planned at a different time and place, and involved a different victim, and so was not so closely related to the originally charged theft offenses.

11

recently explained, "[t]o hold otherwise . . . would allow the government to circumvent the Sixth Amendment right to counsel merely by charging a defendant with additional related crimes after questioning him without counsel present." Arnold, 106 F.3d at 41 (internal quotation and brackets omitted). Accord Doherty, 126 F.3d at 776. Moreover, if state and federal authorities cooperate in their respective investigations, as they indisputably did here, the fact that the two sets of charges were "brought by different sovereigns is irrelevant to this analysis." Doherty, 126 F.3d at 776. See also United States v. Laury, 49 F.3d 145, 150 n.11 (5th Cir. 1995) ("If . . . the charges to which the Sixth Amendment right has been invoked and the new charges are `inextricably intertwined,' the Sixth Amendment right may extend to the new charges. . . . In this case the [new] federal charges and [pending] state charges were identical, and therefore invocation of the Sixth Amendment right on the state charges was sufficient to invoke the right on the federal charges."); United States v. Martinez, 972 F.2d 1100, 1105 (9th Cir. 1992) (after defendant was indicted and invoked his Sixth Amendment right to counsel on state weapons charge, that charge was dismissed and he was interrogated and then indicted on strikingly similar federal weapons charge; the court held that if "federal and state authorities worked together in shuffling his charge from the state to the federal system" they violated their "`affirmative obligation not to act in a manner that circumvents'" his Sixth Amendment "`right to counsel'") (quoting Moulton , 474 U.S. at 171); United States v. Foreman, ___ F. Supp. ___, 1998 WL 4284 (S.D.N.Y. Feb. 2, 1998) (adopting closely related exception when pending state charge is inextricably intertwined with new federal charge); United States v. Rodriquez, 931 F. Supp. 907, 926-27 (D. Mass. 1996) (adopting "closely related" exception where state and federal charges "arise from identical conduct" and federal investigator was "fully aware of the state charges" at time he interrogated defendant).**2**

_____

**2** Indeed, some courts have concluded that if state and federal authorities engage in deliberate misconduct, colluding to "circumvent" the accused's Sixth Amendment rights, this provides an additional, independent, basis for finding an exception to the Sixth Amendment offense-specific rule. See, e.g., United States v. Hines, 963 F.2d 255, 258 (9th Cir. 1992); see also United States v. Nocella , 849 F.2d 33, 36 (1st Cir. 1988). In addressing the collusion exception, Judge Ellis concluded that although state and federal authorities undeniably cooperated in their investigation, they did not improperly collude to "thwart" Melgar's "in-

12

In <u>United States v. Kidd</u>, 12 F.3d 30, 32 (4th Cir. 1993), we, too, addressed the parameters of the "closely related" or "inextricably intertwined" exception to the "offense-specific character of the Sixth Amendment." Chief Judge Wilkinson explained that in order to fall within the "closely related" exception, "the offense being investigated must derive from the same factual predicate as the charged offense." <u>Id.</u> Because Kidd's later offenses "involved a different purchaser-informant, occurred at a different time, and took place in a different location" than his previously charged crimes, he could not meet that requirement -- "place, time, and person involved were all different." <u>Id.</u> (internal quotation omitted). Melgar asserts that, unlike Kidd, his later federal offenses do involve the same time, place, and conduct as

_____

voked Sixth Amendment right." <u>Melgar</u>, 927 F. Supp. at 951. The judge expressly found that the state police officer's initial contact with Agent Miner "was not part of a conscious plan or effort to circumvent [Melgar's] invocation of his right to counsel in connection with the state charges" and that "[a]t the time of his interview of defendant, [Agent Miner's] sole interest was defendant's alienage and deportability." <u>Id.</u> at 945 n.7, 946. Our review of the record demonstrates that Judge Ellis' findings were not clearly erroneous.

We note that on appeal Melgar heavily relies on Agent Miner's report, dated November 29 -- the day of his interview with Melgar -- to demonstrate asserted collusion between federal officials and the Virginia Gang Task Force [VGTF]. The report states:"VGTF agents and this writer are pursuing federal charges against subject for alien in possession of a firearm." Melgar argues that this sentence flatly contradicts Miner's testimony at the suppression hearing that he "did not believe" he knew about any planned federal charges against Melgar as late as December 12. Because Melgar never asserted this argument below, the prosecution never had a chance to address it. This certainly presents an excellent reason to follow our usual rule and refuse to consider arguments not initially made to the district court absent plain error. <u>See, e.g.</u>, <u>United States v. Maxton</u>, 940 F.2d 103, 105 (4th Cir. 1991). Clearly, there was no plain error here. The face of Miner's report comports with the government's explanation, offered at oral argument, for the seeming inconsistency -- Miner prepared the report over a period of time and added the sentence on which Melgar relies <u>after</u> December 12. Thus, the report is "dated" November 29, but indicates that Miner did not submit it to another INS officer until December 20; and the text of the report contains two different type faces, suggesting preparation at different times.

13

the pending state offenses. Accordingly, he contends that the "closely related" exception applies in his case and required suppression of his statements to Agent Miner.

Melgar is correct that his state and federal charges involve the same time, place, and conduct. Specifically, both the state and federal firearm possession charges are based on the seizure of a gun from Melgar when state police arrested him on November 26. Similarly, the state and federal drug charges arose from seizure of marijuana during that arrest, and both the state and federal false identification card charges stem from Melgar's possession, at the time of that arrest, of a single document -- a false alien identification card.

However, the fact that the old and new charges involve the same time, place, and conduct is not enough to invoke the"closely related" exception. A defendant must also demonstrate that the interrogation on the new offenses produced incriminating evidence as to the previously charged offenses. See Kidd, 12 F.3d at 33. Courts have not applied the closely related exception in favor of a defendant absent the production of such evidence. See, e.g., Moulton, 474 U.S. at 162; Arnold, 106 F.3d at 39, 41-42; Micheltree , 940 F.2d at 1341-42; Foreman, 1998 WL 42844 at *4; Rodriquez, 931 F. Supp. at 926-27; People v. Clankie, 530 N.E.2d 448, 460-61 (Ill. 1988). See also Martinez, 972 F.2d at 1105.

Thus, we decline to adopt Melgar's interpretation of the closely related exception. Although the closely related exception is required to prevent the government from "acting in a manner that circumvents" the Massiah right, Moulton, 474 U.S. at 171; see also Doherty, 126 F.3d at 776; Arnold, 106 F.3d at 41, it must be crafted to avoid hampering legitimate, necessary law enforcement investigations. After all, as we noted in Kidd, "[t]he Sixth Amendment does not create a sanctuary for the commission of additional crimes during the pendency of an indictment." Kidd, 12 F.3d at 33.

In the case at hand, the district court concluded that because Agent Miner's interrogation produced no evidence "necessary to prove the state charges," Melgar's Sixth Amendment rights were not violated. Melgar, 927 F. Supp. at 952 (emphasis added). We cannot agree. Although Miner's interrogation did not elicit the only evidence proving an element of the state charges, Sixth Amendment Massiah violations have never turned on whether an interrogation produced

14

evidence _necessary_ to prove an offense. Rather, the test has always been whether the interrogation produced "incriminating" evidence. Massiah, 377 U.S. at 206-07 ("damaging testimony" and "incriminating statements" elicited from defendant in violation of his Sixth Amendment right to counsel "could not constitutionally be used by the prosecution as evidence against him at his trial"). Indeed, nowhere in Massiah itself did the Supreme Court determine that the "incriminating" statements were _necessary_ to the defendant's conviction and the Second Circuit dissenter indicated that they were not. See United States v. Massiah, 307 F.2d 62, 73 (2d Cir. 1962) (Waterman, J. dissenting) ("other substantial evidence of guilt was introduced at trial"). Moreover, the Court has broadly construed "incriminating" to include any evidence damaging to the defendant's case. See, e.g., United States v. Henry, 447 U.S. 264, 269-270, 273 (1980) (government elicited "incriminating statements" or "information that an accused would not intentionally reveal to persons known to be Government agents" in violation of a defendant's Sixth Amendment Massiah rights); see also Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980) ("incriminating" for Fifth Amendment purposes includes "any response [from the defendant] -- whether inculpatory or exculpatory -- that the _prosecution_ may seek to introduce at trial"); Miranda, 384 U.S. at 476 (the Fifth Amendment "privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination").

Miner's interrogation did indeed produce incriminating (although not "necessary") evidence as to the pending state false identification card charge. The agent elicited that Melgar had come to this country illegally and had been here for some time, producing evidence of motive and opportunity for Melgar to obtain a false identification card.

Furthermore, Agent Miner, like the police officers in Moulton, knew of the defendant's pending charges to which the defendant had invoked his Sixth Amendment right to counsel. Indeed, INS Agent Miner, having consulted with state police officers, knew that Melgar had been arrested on charges stemming from possession of a fictitious _alien_ identification card. Based on this knowledge, Miner, like the officers in Moulton, must have known that he was likely to obtain incriminating statements from Melgar. The Supreme Court in

15

<u>Moulton</u> expressly noted that because "[d]irect proof of the State's knowledge will seldom be available," all that is needed to establish a Sixth Amendment violation is that the state "must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel." <u>Moulton</u>, 474 U.S. at 176 n.12 (internal quotations omitted).

Of course, Agent Miner, like the police in <u>Moulton</u>, provided "alternative, legitimate reason[s]" for the interrogation. <u>Id.</u> at 180. Miner claimed that he needed to investigate Melgar's other unlawful conduct, i.e., his illegal entry into the United States; the police in <u>Moulton</u> offered precisely the same reason for surreptitiously recording the defendant after he had been indicted -- the need to investigate his other unlawful conduct. The <u>Moulton</u> Court held that to admit evidence "obtained from the accused in violation of his Sixth Amendment rights" simply because the police "assert an alternative, legitimate reason" for the interrogation "risk[ed] the evisceration of the Sixth Amendment right recognized in <u>Massiah</u>," and so rejected this rationale. <u>Id.</u> We must similarly reject it here. Thus, Melgar's post-indictment incriminating statements, like Moulton's, should have been suppressed.

Melgar's victory, however, is pyrrhic. Although the admission of incriminating statements regarding his alien status violated his Sixth Amendment rights and so constituted error, that error was harmless. An error is harmless if "viewing the record as a whole, it is `clear beyond a reasonable doubt that the jury would have returned a verdict of guilty' absent the testimony." <u>United States v. Jones</u>, 913 F.2d 174, 177 (4th Cir. 1990) (quoting <u>Alston v. Garrison</u>, 720 F.2d 812, 817 (4th Cir. 1983)). "In considering the harmlessness of the error, it is proper to consider other evidence of the defendant's guilt." <u>United States v. Davis</u>, 657 F.2d 637, 640 (4th Cir. 1981).

At Melgar's trial, Officer Lowrey testified that at the time of arrest, officers found a laminated "resident alien" card with "a picture that resemble[d] Mr. Melgar" and a signature that bore the name "Jose Aldalberto Melgar" in Melgar's wallet. Based on his experience as a police officer, Officer Lowrey stated that he knew from viewing the card that it was fraudulent. He explained:

> A valid resident alien card is a picture of the whole card, everything is one picture, it should be smooth. The seal

16

should overlap into the picture of the person it's issued to without obliterating the picture or the seal. Here, you can see it does not move into the seal at all. You can feel that this picture is not a part of the card. It obviously is a cut-out picture that has been placed under there.

Agent Miner corroborated Officer Lowrey's assessment as to the obvious falsification of the card.

This evidence was not in any way controverted at trial, and we can only conclude that, even absent introduction of Melgar's statements to Miner concerning his illegal alien status, "it is clear beyond a reasonable doubt" that the jury would have returned a verdict of guilty on the charge of possession of a false alien identification card.**3**

AFFIRMED

_____

**3** Admission of Melgar's statement was even more clearly harmless with regard to the marijuana and weapons charges. The evidence as to the marijuana charge was uncontradicted and independent of information contained in Melgar's statement to Agent Miner. We are confident "beyond a reasonable doubt that the jury would have returned a verdict of guilty" on the marijuana charge absent Melgar's statement. See Jones, 913 F.2d at 177 (internal quotation omitted). The evidence related to the possession element of the charge of possession of a weapon by an illegal alien was similarly uncontradicted and independent of the information in Melgar's statement. Melgar's statements to Miner, however, proved that Melgar was an illegal alien, and thus incriminated him as to the alienage prong of this charge. Nonetheless, admitting this evidence was harmless because, independent of the interrogation, the government would have "inevitably discovered" Melgar's alien status. See Nix v. Williams, 467 U.S. 431, 444 (1984) (allowing conviction to stand despite Sixth Amendment violation where the evidence impermissibly obtained "would inevitably have been discovered"). Agent Miner testified that he confirmed Melgar's alien status by checking Melgar's name and false identification number in two computer systems maintained by the Immigration and Naturalization Service. Apparently, Miner did not complete this process until after he had questioned Melgar. However, Melgar's name and the number on the false identification card provided all of the information necessary to complete the computer investigation and so establish Melgar's illegal status. Given that the police obtained this information when they arrested Melgar and he gave his incriminating statement, they would inevitably have learned of Melgar's illegal status regardless of Miner's interrogation.

17