**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 97-4367

HARRY SWIGER, JR.,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(CR-96-11)

Argued: December 2, 1998

Decided: January 21, 1999

Before MICHAEL and TRAXLER, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stephen Sean Murphy, Morgantown, West Virginia, for
Appellant. Zelda Elizabeth Wesley, Assistant United States Attorney,
Clarksburg, West Virginia, for Appellee. **ON BRIEF:** William D.
Wilmoth, United States Attorney, Clarksburg, West Virginia, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Following a jury trial, Harry Swiger, Jr. was found guilty of being a felon in possession of a firearm, <u>see</u> 18 U.S.C.A. § 922(g)(1) (West Supp. 1998), and two counts of witness tampering, <u>see</u> 18 U.S.C.A. § 1512(b)(1) (West 1994 & Supp. 1998). Swiger appeals, contending that the district court admitted into evidence, in violation of his Sixth Amendment right to counsel, a statement he made to federal agents while he was in state custody. We affirm.**1**

I.

William Elwell ("Elwell") and an accomplice broke into a Harrison County, West Virginia residence and stole several items, including two .22 caliber rifles. An investigation led law enforcement officers to obtain a search warrant for Swiger's residence, where several of the stolen items were located. While the officers were executing the warrant, Swiger told them that the .22 caliber rifles could be found, and they were in fact found, at the home of his father-in-law Arnold Bonnell ("Bonnell").

Swiger was charged with two state offenses, including receiving or transferring stolen property. <u>See</u> W.Va. Code§ 61-3-18 (1997). At the arraignment on this state charge, which was subsequently dropped, Swiger requested and received appointed counsel to represent him.

While he was in state custody, however, federal authorities began investigating a possible felon-in-possession charge against Swiger, who was a convicted felon at the time of his arrest on the state charge. The federal investigation included interviews of Bonnell and Swiger's

_____

**1** We do not address the remaining issue raised by Swiger, concluding that it is clearly without merit.

2

wife. Federal agent Kent Hallsten ("Agent Hallsten") and West Virginia state police officer Keith Talbert ("Officer Talbert") also interviewed Swiger himself while he was in jail on the pending state charge. Before beginning the interview, Hallsten and Talbert informed Swiger of his Miranda rights, and Swiger agreed to be interviewed. Swiger signed a written form entitled "Waiver of Right to Remain Silent and of Right to Advice of Counsel," which explained his right to remain silent and to have an attorney present during the interview but included the following language:

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have made[sic] to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights, and I am willing to make a statement and answer questions.

J.A. 40. During the interview, Swiger told the agents that he purchased two rifles, some old coins, and a porcelain doll from Elwell for $100; that he gave the two rifles to Bonnell in exchange for work Bonnell had performed on Swiger's trailer; that he was unaware the rifles were stolen; that he had prior felony convictions for armed robbery, escape, and breaking and entering; and that he knew he was not permitted to own or possess firearms because of his felony convictions.

Swiger was thereafter indicted for possessing a firearm in violation of 18 U.S.C.A. § 922(g)(1). Prior to trial, the government obtained letters written by Swiger which, it maintained, were intended to persuade Elwell and Bonnell to provide false testimony. As a result, the government obtained a superseding indictment charging Swiger with two counts of witness tampering in violation of 18 U.S.C.A. § 1512(b)(1), in addition to the felon-in-possession charge. Swiger made various pretrial motions, including a motion to suppress the statement he made to Agent Hallsten and Officer Talbert while he was in jail awaiting the resolution of the state charge of receiving or transferring stolen property. The district judge denied his motion and the officers were allowed to testify that Swiger admitted purchasing two rifles and giving them to Bonnell. Swiger was convicted on all three counts of the indictment.

3

On appeal, Swiger asserts that he was deprived of his Sixth Amendment right to counsel during the interview conducted by Agent Hallsten and Officer Talbert. Thus, Swiger contends that the district court should have suppressed his statement. We agree that Swiger's statement was elicited in violation of the Sixth Amendment and that the district court should have suppressed it, but we affirm because the court's error was harmless.

II.

The Sixth Amendment right to counsel entitles a criminal defendant to the assistance of a lawyer "at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." McNeil v. Wisconsin, 501 U.S. 171, 177-78 (1991) (emphasis in original) (internal quotation marks omitted). The government is forbidden by the Sixth Amendment from intentionally extracting an incriminating statement from the accused "after he ha[s] been indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964). This right, however, "does not attach until a prosecution is commenced." McNeil, 501 U.S. at 175. It is "offense-specific," in other words, and"[i]t cannot be invoked once for all future prosecutions." Id.

Because of the offense-specific nature of the Sixth Amendment right to counsel, "government investigations of new criminal activity for which an accused has not yet been indicted do not violate the Sixth Amendment." United States v. Kidd, 12 F.3d 30, 32 (4th Cir. 1993). Instead, it is only the "incriminating statements pertaining to pending charges [that] are inadmissible at the trial of those charges." Maine v. Moulton, 474 U.S. 159, 180 (1985). Therefore, the government generally may question a criminal defendant in harmony with the Sixth Amendment, even one who is in jail awaiting trial, provided the government is investigating new criminal activity unrelated to the pending charges. See Kidd, 12 F.3d at 33 ("[T]he government was investigating Kidd's new criminal activity in an effort to obtain information regarding an offense for which no charge had yet been filed, and thus for which no Sixth Amendment right had been invoked.").

There is an exception, however, to the principle that the Sixth Amendment right to counsel is offense-specific:

4

> [O]nce a defendant has invoked his Sixth Amendment right to counsel, although the government is generally free to interrogate him without counsel as to crimes to which that right has not attached, the government may not knowingly question him as to crimes closely related to those to which his Sixth Amendment right has attached.

United States v. Melgar, 139 F.3d 1005, 1013 (4th Cir. 1998). This "closely related" exception applies if "the offense being investigated ... derive[s] from the same factual predicate as the charged offense." Kidd, 12 F.3d at 33. In examining the underlying factual predicate, we should consider, among other things, whether the charged and uncharged offenses involved the same conduct, whether the conduct occurred at the same time and place, and whether the same people were involved. See Melgar, 139 at 1014.

We think it is clear that Swiger's state charge and the federal offense being investigated arose from the same factual predicate. Swiger was charged under West Virginia law with receipt or transfer of stolen property, namely two firearms. He was charged under federal law with illegally possessing these same two firearms. Both charges were based on the same incident: Elwell's theft and subsequent sale of the firearms to Swiger who, in turn, transferred the rifles to Bonnell. The offenses involved the same time, place, and conduct.

Even if the charged and uncharged offenses are founded upon the same factual predicate, however, a criminal defendant cannot avail himself of the closely-related exception unless he shows that the interrogation regarding the new offense provided incriminating evidence as to the pending charges. See id. at 1014-15. Evidence need not be "necessary" to the prosecution's case to be incriminating -- just damaging to the defendant. See id. at 1015.

Swiger argues that the interrogation indeed generated incriminating evidence with respect to his pending state charge, and we agree. The West Virginia statute that prohibits receiving or transferring stolen property provides:

> If any person buy or receive from another person, or aid in concealing, or transfer to a person other than the owner

5

thereof, any stolen goods or other thing of value, which he knows or has reason to believe has been stolen, he shall be deemed guilty of the larceny thereof, and may be prosecuted although the principal offender be not convicted.

W.Va. Code § 61-3-18. During the interview, Swiger admitted that he had purchased two rifles from Elwell which he later gave Bonnell in payment for work Bonnell purportedly performed for Swiger. These admissions certainly provided evidence that Swiger received stolen property and then transferred it. Even though Swiger denied knowledge that the firearms had been stolen, he readily acknowledged receiving and transferring them, both of which are elements of the offense of receiving or transferring stolen property. See W.Va. Code § 61-3-18. Because Swiger made several statements to Agent Hallsten and Officer Talbert which went directly to establishing elements of the pending state offense, we conclude he was entitled to the benefit of the closely-related exception to the offense-specific character of the Sixth Amendment. See Melgar, 139 F.3d at 1014-15; Kidd, 12 F.3d at 32-33. And, because Swiger was so entitled, the district court should have suppressed his statement.

III.

Having concluded that Swiger's statement was improperly admitted into evidence, we turn to consider whether the trial court's error was harmless. We will find that an error is harmless if "viewing the record as a whole, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the testimony." Melgar, 139 F.3d at 1016 (citations and internal quotation marks omitted). Even without Swiger's statement, the evidence of guilt on the federal felon-in-possession charge was overwhelming. The fact is that Swiger admitted his involvement with the guns and his possession of them to a state officer during the search of his residence long before the statement in question was obtained. Harrison County Deputy Sheriff L.L. Rogers, the officer who initially investigated the burglary, testified that Swiger admitted having physical possession of the two firearms:

> Q Were you one of the individuals that executed the search of Mr. Swiger's residence?

6

A I am.

Q Was Mr. Swiger home at the time you executed the search warrant?

A He was.

. . .

Q When you executed the search, did you find the guns in Mr. Swiger's home?

A I did not find these two rifles. No, ma'am.

Q Were you given an opportunity to question the defendant about the guns?

A Yes, ma'am.

Q Did the defendant tell you anything about the guns?

A Yes, ma'am.

Q What was it that he told you?

A That Billy Elwell had approached him October the 31st, I believe it was, Monday afternoon . . . and sold him the guns, along with . . . other items, for $100.00, and he had taken those guns that afternoon, Monday afternoon, to his father-in-law's residence in Lumberport and sold him the guns and [another item] for $100.00.

Supp. J.A. 7-9. Bonnell, Swiger's father-in-law, also testified that Swiger brought the firearms to Bonnell's residence:

Q Do you recall getting a phone call from the Defendant?

A Yes, I do.

Q What was his phone call regarding?

7

A He had called me and asked me if I was interested in purchasing some rifles.

Q Did he say how many rifles?

A He said two.

Q Were you interested in purchasing the rifles from him?

A I told him at that time I'd look at them; you know, if I thought they -- believed to be good rifles, that I was interested in them, yes.

Q Did you make arrangements with the Defendant to see the rifles?

A Yes. I told him I'd come up, and he said, that's all right, he would just bring them down.

Q Did he bring them down to your home?

A Yes, he did.

Q Were you home when the Defendant showed up?

A Yes.

Q Where were you?

A I was in the opening of the garage, and when I seen him pull up, I walked out to the vehicle.

Q What happened when you walked up to the vehicle?

A He was out of the vehicle, and he had opened the trunk to the car, and he proceeded to take the rifles out of the car.

Q Did he hand you the rifles for you to inspect?

A Yes.

8

. . .

Q Did you agree to buy the guns from the Defendant?

A Yes. When I seen the rifles, I agreed to buy them.

. . .

Q Did you give him the money later?

A Yes. The next morning . . . he came down, and I gave him the $100.00.

J.A. 175-77.

Elwell provided still more testimony that Swiger took the rifles into his physical possession. Elwell admitted that he stole the two rifles and then "took them and put them in my trunk, and I went down the road to Harry Swiger's house, and I stopped there, and I took them out and put them inside and left them there." J.A. 138. He described the exchange of the rifles with Swiger as follows:

Q Was anyone present at the Swiger home when you took the guns there?

A Yes.

Q Who was there?

A Harry Swiger and his wife.

Q Was anyone else in that home?

A I don't think so, but, like I said, it's been a long time.

Q Did you actually go inside the home?

A Yes.

9

Q What did you do with the guns once you arrived inside the home?

A I just took them inside and put them behind the couch.

Q Did Harry do anything for you for putting the guns behind the couch?

A He gave me some money . . . .

. . .

Q Did he give you anything else?

A Some [marijuana].

J.A. 140-41.

Swiger admitted during trial that he paid Elwell $100 for the rifles. Swiger maintained, however, that he bought the rifles for Bonnell, that he never took physical possession of them or even touched them, and that the witnesses to the contrary were simply lying.[2] The government, however, introduced letters written by Swiger after his arrest to Elwell and Bonnell which essentially provided a script for them to use while testifying. Swiger's letter to Elwell explained that "I really need for you to do this and I promise you I will make it worth while to you." J.A. 290. The letters acknowledged that Swiger paid for the rifles, but emphasized that Elwell and Bonnell should testify that Swiger never actually touched the rifles. At trial, Swiger admitted that he offered drugs to Elwell in exchange for his testimony, although Swiger claimed that he made the offer so that Elwell would "tell the

_____

[2] With respect to Deputy Sheriff Rogers' testimony, Swiger claimed that he never told Deputy Sheriff Rogers that he touched the guns. However, Swiger explained that he was "not saying[Rogers was] lying. If that's what they have written down, then I won't say they're not telling the truth." J.A. 283. Rogers, however, testified that Swiger told him that "he had taken those guns that afternoon, Monday afternoon, to his father-in-law's residence ...." Supp. J.A. 9.

10

truth," J.A. 279, and denied suggesting that Elwell change his testimony.

In view of the entire record, we are convinced, beyond a reasonable doubt, that the jury would have found Swiger guilty of violating 18 U.S.C.A. § 922(g) in the absence of Swiger's statement to Agent Hallsten and Officer Talbert. For that reason, the district court's admission of this statement, although erroneous under the Sixth Amendment, was harmless.

IV.

For the foregoing reasons, we affirm Swiger's conviction.

AFFIRMED

11